*BEE, J.
The defense sought to be made by the appellees under the allegation of payment cannot be maintained. There is no evidence nor even a plausible pretense of such payment, unless the receipt by Jackson of the note of Trigg, King & Co. for seven thousand six hundred and fifty-three dollars and seventy-four cents can be so regarded. But it is not shown that this was received by Jackson on account of this debt. Efe had at that ■ time a' large individual debt against Con-nally Findlay & Co. besides that which is the subject of demand in the present case, for the benefit of Highland & Galt. He alleges that this note was taken on account of this individual debt, and the character of the receipt given by him would seem to refer to a debt of this character: nor is there any proof to connect this transaction with the claim of Highland & Galt. The amount received upon this note was credited upon the individual claim, and such appropriation upon the proofs cannot be said to have been improper.
But if this note had been received on account of the claim of Highland & Galt, it would not have amounted to payment or satisfaction. It was received as a deposit by way of collateral security merely, without any undertaking' on the part of Jackson to take measures for its collection. This is distinctly admitted in the answer of Alexander Findlay: Nor can it be said that because Jackson held the note without collecting it, he had lost his right on that account to call upon the parties from whom the original debt was due for payment. He was not bound to collect the note: he held it to receive payment if voluntarily made, but subject to the directions of Connally Findlay & Co. By their direction he sent it to Natchez, where a part was paid, and after it was returned to him, continued to hold it in the same way; but no application was ever made to him afterwards for it. And even if this application of *'the amount received to the individual debt were a misappropriation of the same, it was so in form only, and could not prejudice the estate either of King or Con-nally Findlay. Both were liable for both debts and thus got the benefit of the credit: and as the estate of William King was also liable for the note of Trigg, King & Co. as was also that of James King and William Trigg, they cannot impute laches to Jackson in failing to coerce payment from themselves.
Nor will the doctrine of presumptions afford any aid to this defense. The notes bore date on the 23d of November 1807, and were payable in twelve, twenty-four and thirty months after their date, respectively. Suits were brought against Connally Find-lay in 1810, and judgments recovered upon two in 1811, and upon the third in 1812; and the present, suit was brought in January 1825. Between the maturity of the note first payable and the institution of this suit was a little upwards of sixteen years, and this time upon a question of payment is sufficiently accounted for, and any presumption of payment fully repelled.
Jackson was a nonresident of the state, and was seeking the recovery of his debt by suits against Findlay, the surviving partner. In 1811 a payment of one thousand dollars is made which is credited upon the note first payable. In 1813 the debt is recognized in a letter from Connally Find-lay & Co. to Jackson, and payment promised in cotton. In 1817 Findlay pays five hundred dollars, and promises a further payment in a short time; and in the same letter makes his acknowledgments for the indulgence he had received. And in 1819, Findlay having recently died, steps are taken to revive the judgments by writs of scire facias. These circumstances would seem to be abundantly sufficient to meet any presumption of satisfaction. But in truth any question of this character must now be regarded as out of the case; for ^payment was pleaded in bar of the writs of scire facias and the cases were tried upon issues joined on that plea, and the jury found in each case against the plea, and judgment was rendered accordingly. And in 1828, under the orders of reference made in this cause, Commissioner Campbell reports this debt as unpaid, and ascertains the amount then due to be eight thousand five hundred and eighty-six dollars and eight cents. Exceptions were taken, it is true, to the allowance of interest and, the mode of computing it, but none to the recognition of the debt as still subsisting and unpaid.
The plea of the statute of limitations cannot avail the appellees. As to the representatives of Findlay there can of course be no pretense for its application ; and as it respects the representatives of King it may be questioned whether the case would be within its operation. The demand is in equity against thte estate of a deceased partner, the creditor having been unable to obtain satisfaction from the surviving partner. But against the latter he had regularly commenced proceedings in due time, and *679 liad prosecuted the same to judgment. Whether the court would apply the statute from the same period at which it would commence to run in the action against the surviving partner, or would hold the estate of the deceased partner bound by the proceedings against the latter, and regard the bar of the statute as saved by these, is a question that may not be altogether free from difficulty. But it is unnecessary to express any opinion upon it because it is a sufficient answer to the plea, that the notes were given in Maryland, and that Jackson then was and up to the bringing of the suit continued to be a nonresident of Virginia, and so was within the exception in favor of nonresidents in the act in force at the time the suit was brought. The bill alleged the nonresidence of Jackson and a pure plea of the statute *wottld not avail. It should be accompanied in some form with a denial of the nonresi-dence, or an allegation that Jackson had been within the state after the cause of action accrued. Sto. Eq. Pl. $ 753; Coop. Eq. Pl. 232; Bayley v. Adams, 6 Ves. R. 586; Chapin v. Coleman, 11 Pick. R. 331; James v. Sadgrove, 1 Sim. & Stu. 4. There is no such denial or allegation to be found here, and there is no proof that Jackson ever was in Virginia at any time.
That the estate of King was not discharged in equity by his death will be readily conceded, but the character of the liability and the time and manner in which it was to be enforced, might admit of serious discussion if they were still open for consideration. The modern English doctrine would seem to be that the liability of the estate of the deceased partner is direct and immediate, and does not depend on the state of the relations between the partners, or the result of measures taken to collect the debt from the surviving partner.- But the cases in Virginia would seem to lead to a very different conclusion. Linney’s adm’r v. Dare’s adm’r, 2 Leigh 588; Sale v. Dishman’s ex’ors, 3 Leigh 548; Galt v. Galland’s ex’or, 7 Leigh 594; Jackson v. King’s reps., 8 Leigh 689. These cases, and the opinions of the judges, tend strongly to show that the liability of the estate of a deceased partner in any case is not absolute and immediate, but contingent merely, depending upon the result of proper efforts to collect the debt from the surviving partner or his ascertained insolvency.
But what may be the true solution of the abstract question, it is not material to en-quire ; because for all the purposes of this case the question must be regarded as settled by the decree of this court of the 15th of August 1837. Eor this court was of opinion and so adjudged, that the representatives of King were properly made parties because they were ultimately chargeable in the event of Eindlaj^s funds proving ^inadequate, unless the equitable rights of the appellant against them were lost by his neglect or misconduct; and that it was premature to hear and dismiss the bill as to them before it was matured ' as to Eindlay’s representatives, their liability being dependent upon the issue of the proceedings and the result of the en-quiries in relation to Eindlay, the surviving partner. Thus it must be taken to be adjudicated between these parties, that the liability of King’s estate is not absolute and immediate, but secondary and contingent only, depending on the result of the proceedings against Eindlay and the absence of misconduct or neglect on the part of the appellant in commencing and prosecuting such proceedings. These have hitherto been ineffectual, and satisfaction has not yet been obtained from Eindlay or his estate; and if any question whether they had been sufficiently tested at the time of the institution of this suit, is now concluded by the decree of 1837, there yet remains by the very terms of that decree, the important enquiry as to the manner in which the creditor has conducted himself in regard to Eindlay and his estate, and whether in the course which he has pursued, there has been any such “misconduct or neglect,” such laches, as should repel his claim to the equitable relief which he now seeks.
The claim to charge the estate of a deceased partner with a debt of the firm is one recognized in the court of equity only; and as Lord Eldon observed in Kendall, ex parte, 17 Ves. R. 514, 526, the right “standing only upon equitable grounds, if the dealing of the creditor with the surviving partner has been such as to make it inequitable that he should go against that fund (the separate estate of the deceased partner), he would not, upon general rules and principles, be entitled to the benefit of that demand.” Indeed, the opinion of Lord Thurlow in Hoare v. Contencin, 1 Bro. *C. C. 27, implies strong doubts as to the existence of any principle upon which a debt extinguished at law by the death of one jointly bound, shall yet be set up in equity against the estate of the deceased party; and Kord Eldon expresses his surprise that a court of equity should have interposed to enlarge the effect of a legal contract in such a case, though he admits the modern doctrine to be that a court of equity will under certain modifications, enable the creditor to resort to the assets of a deceased party who was jointly bound with others who have survived him. Kendall, ex parte, 17 Ves. R. 524, 525.
But this right being thus confessedly the creature of the court of equity, will be administered only upon its own terms and according to its general rules and principles. And it may be waived by the creditor, or it may be lost by the course and conduct which he adopts ; and thus the equity which he would otherwise have had, will be entirely repelled. This is distinctly stated by Lord Hardwicke in Bishop v. Church, 2 Ves. sen. 371; and is recognized as the law by Judge Carr in Kinney’s adm’r v. Dare’s adm’r, 2 Leigh 588, 595, and by Judge Tucker in Sale v. Dishman’s ex’ors, 3 Leigh 548, 557. As it is expressed by the *680 last named judge, “the equity may be rebutted if the party is guilty of fraud or collusion, or even of laches. ” The correctness of this doctrine is also very fairly to be deduced from the cases of Lane v. Williams, 2 Vern. R. 272; S. C. 292; Daniel v. Cross, 3 Ves. jr. R. 277; Devaynes v. Noble, Sleech’s Case, 1 Meriv. R. 396, 528; although under the particular circumstances of those cases the right was held not to have been lost.
What shall be said to be such laches as will deprive the creditor of the right to resort to the separate estate of the deceased partner, is no where ascertained with any thing like precision. As said by Judge ^Tucker in Sale v. Dishman’s ex’ors, there is no settled rule or analogy yet established upon the subject. The same learned judge informs us that to require the same diligence which is demanded in cases of bills of exchange was very readily considered out of the question. And he seems to think that to put the case on the footing of the implied contract for due diligence between assignor and as-signee, would be pregnant with the evil referred to by the -master of the rolls, in Sleech’s Case in Devaynes v. Noble, 1 Meriv. R. 529. He is of opinion there can be no fair analogy between the case of the deceased partner and that of the assignor of a bond. The latter, he says, has parted with his interest and stands merely as a guarantorThe former was one of the joint debtors, and at his death the obligation ought to devolve with his estate upon his representatives. He agrees however that the court, of chancery will not charge his estate with the equity until the insolvency of the survivor is ascertained, but says he is not aware of any express decision which requires the creditor to proceed within any limited time. He appears rather to place the liability on the footing of a suretyship, for he says that what is meant by laches is the failure to sue when required so to do; and that without such requisition he is in no sort culpable, though he agrees that the estate of the deceased partner may also be absolved by collusion, by giving time to the surviving partner, or.by new arrangements with him.
With great deference, I think this is unduly limiting the range of the duties devolving upon a creditor who would preserve his resort to the estate of his deceased joint debtor,, and within which only he may be guilty of such laches as will absolve that estate. And I incline to think the analogy is stronger to the case of the assignor of a bond than to that of a surety. If we are to regard the estate of the deceased partner *(as for the purposes of this case it must be regarded) as only secondarily and contingently liable upon the establishment of the insolvency of the deceased partner, it stands in effect like the assignor, as a mere guarantor: it is not liable at once and directly as a surety, nor has it the rights or remedies of a surety against the surviving partner if the debt should be discharged out of the assets. Nor can there be any special fitness in requiring demand upon the creditor from the representative of the deceased partner to sue the survivor. He has no control over the social effects nor the books of the firm: all pass together to the surviving partner. He may not know or have the means of knowing who are the firm creditors, as they are presumed to make no call upon him till they have pursued the surviving partner in vain. And as he may not therefore be able to make the demand upon the creditor to sue, from the very nature and character of the liability, a sufficient warning should be implied that the latter must adopt such a course as will afford a just and reasonable protection to the estate of the deceased partner, and not subject it to wanton or unnecessary peril. I have seen no case sanctioning the suggestion that laches consists only in the failure to sue after request; while in one case it was distinctly held by Lord Hardwicke that the mere failure to sue, after being applied to do so, will not of itself be sufficient to absolve the estate of the deceased party. Bishop v. Church, 2 Ves. sen. 371.
It is in vain to look to the cases for any rule by which to determine the character of this laches, or to measure its precise extent. Sleech’s Case, in Devaynes v. Noble, 1 Meriv. R. 529, only maintains that the creditor shall not be held to a very rigorous course of proceeding, nor required to use the greatest possible diligence to compel immediate payment by the surviving partner ; and one of the reasons assigned is that *such a course might do injury to the estate of the deceased partner by so hurrying the survivor as to disable him from meeting the engagements of the firm, and thus bring a debt upon the estate, which, if less rigor had been exercised, it might have wholly escaped. Miss Sleech had suffered her money to remain in the hands of the survivor of a banking firm for some eight months after the death of the other partner, when the former became bankrupt; and it was held by the master of the rolls, Sir William Grant, that her failure to prosecute her demand during this interval was not such laches as would absolve the estate of the deceased partner; and that the fact of her having received a part of the balance due her from the surviving partner, and afterwards signing his certificate as a bankrupt, were not such dealing with him as amounted to a waiver of her claim against the former. But it is no where intimated that the creditor cannot lose his equity by what would amount to laches, but the contrary is fairly implied throughout the whole case; and certainly there is nothing in the case or in the opinion of the master of the rolls to warrant the broad and sweeping terms employed by the chancellor in Hamersley v. Lambert, and of which even Judge Tucker expresses disapprobation in Sale v. Dishman’s ex’ors, 3 Leigh 548, 560.
In Lane v. Williams, 2 Vern. R. 277 *681 (Raithby’s edition), the note in question is stated in a note of the editor, to have been of about one year’s standing- only, though the master of the rolls in Sleech’s Case supposed the laches to have been much greater than in the case then before him. Judge Tucker supposes that the case is incorrectly reported, and that it may have been decided upon some other principle. Sale v. Dishman’s ex’ors, 3 Leigh 558 n. Certainly a delay of one year would hardly suffice to bar the creditor’s equity except under very peculiar circumstances.
*In Daniel v. Cross, 3 Ves. jr. R. 277, the interval which occurred before the bankruptcy of the surviving partner, was about two years. The partnership was dissolved in March 1791. The death of the deceased partner had occurred in June 1791, and the bankruptcy of the new concern did not happen till March 1793. It was held that this lapse of time was not sufficient of itself to exclude the claim upon the estate of the deceased partner.
In Hamersley v. Lambert, 2 John. Ch. R. 508, the partnership was dissolved by the death of one of the partners in September 1803. The other partner was discharged under the insolvency law of the state of New York in October 1807. It was held that this delay of some four years would not bar the equity against the estate of the deceased partner.
Yet none of these cases, nor any other that I have seen, can be regarded as establishing any thing inconsistent with the doctrine recognized in the Virginia cases, that such an equity may be lost by the laches of the creditor. It is true in the case of Hamersley v. Dambert, the doctrine stated to be deducible from Devaynes v. Noble, 1 Meriv. ubi sup. 528, is laid down in very broad and general terms. But the case itself will not justify the deduction made from it, nor was the assertion of any such doctrine demanded by the exigencies of that case or of the case of Hamersley v. Lambert.
Assuming then that laches will bar the creditor’s equity, but finding no precise and definite rule by which to measure the delay and neglect which shall be said to amount to it, each case must, I apprehend, stand on its own circumstances, and be judged of by them. The right to charge the estate of the deceased partner, we are told by the Lord Chancellor in Kendall, ex parte, ubi sup. 524, is an equity to be enforced only upon equitable principles ; and it should depend therefore, *for its preservation, upon the observance by the creditor of good faith, the exercise of a certain reasonable diligence, and the maintenance of a just and proper regard for the rights and interests of the deceased partner. If, as for the purposes of this case we must accept it, the doctrine be that the right to resort to the estate of the deceased partner is secondary and contingent only, depending upon the ascertained insolvency of the surviving partner, or the result of fruitless efforts to obtain payment out of his estate, if the surviving partner be not notoriously or absolutely insolvent at the time of the death of the deceased partner, or at the maturity of the debt, if that only occurred after his death, it cannot be unreasonable to require that the creditor should commence and prosecute with at least reasonable or ordinary diligence, the proper proceedings to compel payment from the surviving partner. While he may not be held to adopt a very rigorous course nor to exercise the utmost possible diligence, at least he may be required within a reasonable time to place the debt in the ordinary channels of collection, and to give it that attention during its progress which may render it probable that in the usual course the money may be made, and the estate of the deceased partner thus saved harmless. The surviving partner takes the whole social effects, and upon him devolves the duty of discharging the partnership debts. He has the appropriate fund out of which they should be paid, and there can be no legal presumption that that fund will prove inadequate. Dike the assignor of a bond, the estate of the deceased partner is bound only to guarantee against the insolvency of the surviving partner, and is only to be made responsible when that is established. Why then should the creditor not be held to reasonable diligence as in the case of the assignor? It would be utterly vain and illusorj' to declare the estate of the *deceased partner to be only liable when the insolvency of the surviving partner has rendered the efforts to compel payment from him ineffectual, if the creditor may rightfully forbear proceedings indefinitely, until the party who might have been previously perfectly good should become insolvent, or having commenced them, suspend collection at pleasure, or suffer them to slumber for a series of years, during which the survivor may waste both the social effects and his own private estate, and thus inevitably cast a debt, which he ought to pay and which might have been made, upon the estate of the deceased partner. The right to call upon his estate to make good the debt upon the failure of the efforts to compel payment from the surviving partner, carries with it, by just and necessary implication, the duty of making such efforts bona fide, and with at least ordinary or reasonable diligence. Where this has been wanting, where measures have been taken to compel payment from the surviving partner, but there has been gross, wanton and unaccountable delay in the proceedings adopted, and it is palpable that the consequence of such delay will have been to cast up on the estate of the deceased partner (if it be held liable) a partnership debt of which payment could undoubtedly have been obtained from the surviving partner, and which it was his duty to pay, I think this is such laches as will forbid a court of equity to lend its aid to subject the estate of the deceased partner.
In Sale v. Dishman’s ex’ors, all the judges were agreed that the liabilitj' of the estate *682 of the deceased partner depends on the ascertained insolvency of the survivor, and from their opinions it is plainly to be inferred that the equity of the creditor may be lost by misconduct or laches. But they considered the question of laches as not sufficiently presented by the pleadings in that case, and therefore that it was not necessary to make any decision upon it. Judge Cabell, ^however, concurs with Judge Tucker in thinking the diligence required is not that which is necessary as between endorser and endorsee, assignor and assignee, though he differs from him in regard to the effect of a failure to sue after request. Judge Carr does not advert to this point, but he gives us a very distinct idea of what was his understanding as to the measure of diligence required in such a case. For he says, “But Sale (the. creditor) with Berryman’s bond (the surviving partner’s bond) in his possession, waited upwards of four years before he took any step to recover the money; and if Dish-man’s executors (the executors of the deceased partner) had put this matter in issue, and shown us that but for this delay the money might have been made out of Berryman, I strongly incline to think that this also would have been such conduct as would have rendered it inequitable to permit his resort to the estate of Distraían.’’ And he quotes the remark of Bord Hard-wicke in Bishop v. Church, that “the plaintiff must come as from a pure fountain; must show himself not to be guilty of any laches, much less collusion, turning to the prejudice of the other side, which might be strong enough to rebut that equity set up beyond what the rule of law admits.”
So in Linney’s adm’r v. Dare’s adm’r, 2 Leigh 588, we have another illustration of this learned judge’s views upon this subject. The debts in question were created the one in 1799, and the other in 1801. Murray, the surviving partner, regularly paid up the interest on the first debt till the 1st of December 1816, and on the last till the 1st of January 1817, and he continued solvent till about November 1817, but afterwards became insolvent, and so died. It was shown that it was owing to Binney’s (the creditor’s) indulgence that the debt was not early obtained from him,; but there was no other proof of laches on his part excepting *the'mere delay which he had permitted. The case went off upon the question of jurisdiction, the court being of opinion that there was a plain and adequate remedy at law against Ross, the surety for the debts, who was still living and solvent; but Judge Carr went into an examination ' of the circumstances, and upon the merits seems to have had no difficulty in declaring his opinion to be that Binney had no well founded claim in equity against Dare’s representatives. His remarks on this branch of the case are omitted in the report, but the result at which he arrived must of course have been deduced from the long indulgence given by the creditor, and the failure to collect the debt when it was perfectly in his power to do so, as constituting such laches or such a manifestation of purpose on his part to look to the surviving partner alone, as would put an end to the equity against the estate of the deceased partner.
Bet us now glance briefly at the main features of the case before us.
The notes constituting the debt claimed, bear date on the 23d of November 1807. William King died about the 13th of October 1808. On the 21st of November 1809 Jackson took from Connally Findlay & Co. the note of King, Trigg & Co. for seven thousand six hundred and fifty-three dollars and seventy-four cents, but, as he alleges, to be applied to his individual debt. On the 30th of April 1810 he brings suits upon the two notes first payable, and on the 17th of September 1810 he brings suit upon the third. On the 22d of May 1811 a payment of one thousand ^dollars is made, for which due credit appears to have been given. On the 31st of May 1811 he recovers judgments upon the two notes first named, and on the 29th of May 1812 he recovers a judgment upon the third, all these judgments being against Findlay and the securities for his appearance. Upon the last named judgment an execution was issued on the 14th of *January 1814, but the same was not placed in the hands of any officer for service, nor was it ever served or returned. Upon the two previous judgments no executions were ever issued. In 1813 Jackson offered to take cotton for the debt; and A. Findlay1- for Connally Findlay^ & Co. writes in reply, promising to furnish the cotton accordingly.
In 1817 Findlay acknowledges the receipt of a letter from Jackson “requiring a little cashand he sends a note for five hundred dollars, and promises another payment in a short time. And he requests Jackson to accept his thanks for his “silence and indulgence.” And the judgments were suffered to stand without any effort to enforce them during the remainder of Findlay’s life. He died in 1818, and on the 29th of October 1819 writs of scire facias are sued out to revive the judgments against his administrators. These writs are however suffered to slumber on the docket upon the simple issue of payment until June 1827, when executions were awarded. In the mean time, however, that is to say, in January 1825, nearly seventeen years after the death of William King, this bill is filed, alleging that the personal estate of Findlay had been exhausted in payment of other debts, and seeking to charge the real estate belonging to the firm of C. Findlay & Co. ; also that of which Findlay died seized, and also the personal and real estate of William King, with the payment of this simple contract debt: and also claiming payment of another debt which was afterwards confessed to have been previously satisfied.
Now, if it may be said there was no delay of which there could be any just complaint *683 tip to the rendition of the judgments in 1811 and 1812, what is there to account for or to excuse the great delay that was suffered to occur afterwards? Why were executions not issued upon all of the judgments, and placed in the hands of the marshal for service? If this had been done, there can be no doubt from this record the *debts would all have been immediately made. Findlay had succeeded to the whole social effects of C. Findlay & Co. real and personal, and was also possessed of a considerable estate, real and personal, of his own. He died possessed of a personal estate amounting to upwards of ten thousand dollars, besides certain slaves not accounted'for in the settlement of the administration account. Between 1809 and 1817 he appears to have made sundry advancements in slaves to his children. Under the will of William King he was entitled to a legacy of ten thousand dollars, which might have been reached by proper process, and was itself more than sufficient to discharge the whole debt. The real estate also, which might have been subjected, appears to have been considerable and valuable. Yet Jackson, with his judgments not against Findlay only but his appearance bail also in the different cases, who, for aught that appears, may have been perfectly able to make good their respective liabilities, stands by and suffers the whole of this large property to be wasted or appropriated by others, without the slightest effort on his part to have any portion of it applied, as properly it should have been, to his debt. And after Find-lay’s death he contents himself with issuing writs of scire facias, which are suffered to sleep on the docket for years and until nearly every vestige of the large and valuable estate which might readily have been subjected to the debts at any time, had entirely disappeared. What Findlay had not himself disposed of is suffered through the utter neglect of Jackson to be applied to debts of inferior dignity, some due by simple contract merely. And of the real estate belonging to the firm of C. Findlay & Co. nearly the whole is sold and the proceeds appropriated to the payment of a debt which would appear to have been of inferior dignity to those judgments, while that of which Findlay died possessed, the heirs have been ^permitted to sell and to appropriate the proceeds to their own use. And it is perfectly apparent that if this debt be cast upon the estate of King, it will be because of the neglect of Jackson for years to compel payment from Findlay when it was perfectly in his power to have done so at any time.
I think the whole course and conduct of Jackson amount to such a manifestation of purpose to look to Findlay alone for payment of his debt, or discloses such palpable laches in the pursuit of his plain remedies against him, as should rebut any claim to the aid of a court of equity to set Up his demand against the estate of the deceased partner, and that the Circuit court did not err therefore in dismissing the bill as to the representatives of William King.
But although the bill was properly dismissed as to them, I do not perceive why a different and further measure of relief was not afforded against the estate of Find-lay. It is apparent that a large portion of the personal assets of that estate was applied in payment of debts of inferior dignity to that of Jackson. The real estate of which Findlay died seized, and which appears to have been worth between three and four thousand dollars, was bound by these judgments, but appears to have been sold by the heirs (with the exception of two inconsiderable parcels), and the proceeds applied to their own use. Why and how all this could properly be to the prejudice of the appellant, I cannot see from the record before us. And I think the appellant should be allowed to amend the bill, and to make such further allegations and such additional parties as may entitle him to enquire into the apparent devastavit by the administrators of Findlay, and if such be established, to charge those who may be legally responsible for the same, and for this purpose to have the proper accounts directed: and also to investigate further the subject of the real *‘estate of which Findlay died seized, and the propriety of the disposition made of it after his death, and to hold those who may be accountable for the same, or for the proceeds thereof, if any such there be, to their just responsibilities. And upon such investigation the right of the administrators to retain in their hands so much of the proceeds of the sale of lands as was sufficient to pay the amount due to them and the other devisees of Thomas King, and also the balance claimed to be due to them as such adminisfrators, may be the subject of further consideration.
I am of opinion to affirm so much of the decree as dismisses the bill as to the representatives of William King; but in all other respects to reverse the same, and to remand the cause for further proceedings.
DANISH and MONCURH, Js., concurred in the opinion of Lee, J.
SAMUFHS, J., concurred in so much of the decree as dismisses the bill against King’s representatives ; and dissented from so much as directed further proceedings against Findlay’s estate; being of opinion that it should have been dismissed as to these parties also.
AHHFN, P., concurred in reversing the decree as to Findlay’s representatives. But he was of opinion that the estate of King was not discharged, and that the decree should be reversed as to his representatives.
Decree affirmed in part and reversed in part.